Welcome to the Fourth Circuit. Council, we look forward to your presentations. We'll proceed with our first case, Ayala v. Wolfe. Mr. Lester, we'll hear from you whenever you're ready. May it please the Court, good morning. My name is Gene Lester. I represent the plaintiff, Mr. Ayala. It is our request that this Court deny the defendant's motion for summary judgment, allow the motion to amend the complaint, and remand this case to the Middle District of North Carolina for trial. In the early morning hours of July 12, 2010, there was a robbery at a Sonic restaurant in Lexington, North Carolina. The suspects of that robbery were identified as black, they were identified as wearing red clothing, and they were identified as fleeing from the scene. Officer Wolfe, who is a Lexington police officer, heard the call about the alleged robbery and responded to the scene. Unknowingly, Mr. Ayala, my client, the plaintiff, a light-skinned Hispanic male wearing white clothing, was wearing a sidearm, a gun on his waist for protection, happened to be walking home that night and happened to be walking towards the Sonic where this alleged crime had recently occurred. And Officer Wolfe, one of the patrol officers that night, rushed to the scene and on his way away from the scene encountered Mr. Ayala walking towards the scene. And this encounter that night and the inferences and the evidence drawn from it, the credibility of the witnesses, we contend is the subject of a lawsuit, a dispute between the parties as to what factually happened. And we contend that that factual dispute should be resolved at a trial. Mr. Ayala's evidence will show that Officer Wolfe accused Ayala of robbing the restaurant. And Mr. Ayala said, I don't know what you're talking about. At that point, Ms. Officer Wolfe had Ayala on the hood of his patrol car and searched Mr. Ayala. And Officer Wolfe identified the weapon. Had him on the hood of his patrol car? What do you mean? My understanding is that Ayala was standing on a tow car with his hands on the tow car like this and Wolfe was behind him searching. Was he told to put his hands on that patrol car? Yes, Your Honor. And he did? He did, correct. And at that point, Officer Wolfe identified the weapon in Mr. Ayala's waistband. And Mr. Officer Wolfe backed away from the plaintiff and trained his gun on Mr. Ayala without providing any additional instructions to the plaintiff, Mr. Ayala. Now Mr. Ayala contends, and he will say in trial, that he slowly, while looking at the officer, removed the gun from his waistband with his fingers while it was pointed down in a non-threatening manner. And he was told he could take his hands off of that hood? He was not told that, Your Honor. He just decided to take his hands off the hood and get his gun out of his side.  And what described the lighting conditions, as I understand it, was dark? That is the general testimony. At this point, it was dark. However, I believe that the officer pulled his car into a more lighted area, but it was a dark night. So dark area. You've got a person who the officer has, as he told him, put his hands on the hood. The officer feels a gun, backs back, pulls his gun out, and when he does this, your client takes his hands off of the hood. Takes one hand off the hood. No one told him to do that? Nobody did, that's correct. He just did it? That's right. Did he tell the officer what he was getting ready to do? There was no communication between the officers. He didn't say, I'm going to take my hands off this hood because I got a gun and you want me to take it out or what? I'm trying to understand that. There was no communication from Mr. Islay. They were looking at each other. Now, mind you. Did he see the officer pull the gun on him? Yes. And he took his hand off that hood and reached for his gun? Yes, and in the light most... Why on earth would he do that? In the light most favorable to Mr. Islay, he believed that he was disarming himself, that the officer had found the gun. What about the officer? A reasonable officer has someone with their hands on the hood, backs back, pulls a gun on him, and when he does, he knows it's a gun, and then the person reaches up to get the gun without seeing anything? Well, in a non-threatening manner, he reaches to his side. I understand the characterization of the non-threatening manner. Right. But from the objective standpoint, whether you want to call it non-threatening or whatever, he's been told to put his hands on the hood. The officer feels a gun, and he probably, I guess he knows this officer has felt this gun. Right. Officer backs back, pulls his gun out. Why on earth would he move to touch that gun? I mean, if that is dark, it's dark at night, and you see where this is going. I mean, it's a bad situation in terms of the facts from that perspective, but I'm trying to understand, you know, under those circumstances, what is the officer to do? Well, the officer, a reasonable officer should have given him a command. Put your hands back on the car. Put your hand back on the car. Put your hands up. And there's lots of cases. Did he have time? You've got someone who's, someone who you wouldn't, I guess, would you think someone would take their hand off that hood and reach toward a gun unless they had an intent to do something with that gun? You know, the officer could have, once he had felt the gun, asked the plaintiff, Mr. Isla, put your hands behind your back and cuffed him. He could have said, but instead. Well, does the fact that he didn't do that make his conduct unreasonable, his chosen conduct unreasonable, given the circumstances? I think so, Your Honor. I think that's a jury question. And the cases that I've read all show where the law enforcement officer has repeatedly said, put your hands down. Put your hands in a particular place. And those instructions are refused, are not followed. And then there's a gun discharge, there's a firing and a shooting. But do you have a case that says that if an officer fails to do that, that makes his conduct unreasonable on these facts? Or are you simply saying we ought to let a jury figure it out? Right. I think it's a jury question as to whether it was reasonable under those circumstances for an objective officer to do what he did and for Mr. Isla to do what he did at that point in the encounter. And that is an issue of fact. And then after he removes the gun and attempts to put it on the hood, he's shot. Mr. Isla is shot by Officer Wolf. And at that point, the gun falls to the ground. And the gun is on the ground and it is away. His hand is hit first. Then Mr. Isla and Ms. Officer Wolf continues to shoot Mr. Isla across the midsection. What's the evidence that the officer had any knowledge that gun had fallen? It was dark, wasn't it? Right. The evidence in this case on summary judgment, taken in the light most favorable to Mr. Isla, is that the gun was out of his hand, was shot, and it was on the ground. And that's the evidence that should be accepted. The evidence that the officer knew it, should have known it, is what? That he could have seen it. There's, again, there's a case that... Is that all you need, that he could have seen it? Yeah, the evidence is that it was on the ground. That's the evidence that will be submitted to the jury. But the question is, what did the officer know, or what reasonably should he have known? Right. He should have reasonably... Where's the evidence that the officer should have known, any reasonable officer, would have known that the first shot knocked the gun from your client's hand? Because that is... No, my question is, where's the evidence in the record of the officer's knowledge? Well, I think that the inference is that if the fact in the case is that the gun was shot out of his hand, and it's on the ground, then the inference in the light most favorable to the plaintiff is that he was disarmed. He was no longer a threat. No, the question is, what did the officer reasonably know? I think the officer could have reasonably known that. And what is the evidence of that? That they are two men standing very close proximity to each other in an encounter, and these things are unfolding in front of them. Well, there's a difference between a reasonable inference and speculation, and I think you would have the jury speculate on these facts without any direct evidence or circumstantial evidence of what Judge Davis is asking you for. I think what Judge Davis is insinuating is that if the officer testifies, well, I didn't see the gun knocked out of his hand, then there's no way to ever prove, but that's the dispute here. I don't think it's a question of an insinuation. I'm trying to understand this. It's a question of did you present evidence from which any jury could make that determination that this officer saw this happen? And if all you've got is that it happened, and now you want us to infer that he must have seen it in a dark area where, as I understand, there was a question of the flashing of the gun, too. The gun is being fired, and you've got the flash that's coming from it, and he says he didn't see anything and there's no... And I think at that time your client wasn't able to testify as to much of anything, was he, in terms of what the officer actually saw. Right, because, again, my client is essentially robbed of his faculties. I mean, he's being shot. And I think it is speculative for any witness to say this is what so-and-so saw. I mean, that would be completely speculative, and you wouldn't allow a witness to testify what that person's knowledge was. But on the stand, you would ask them, well, do you know? Is that credible? It is a question of the officer's credibility. Mr. Lester, I don't see any evidence in this record of a language problem, but is there an underlying language difficulty between your client and the officer here? Not that I'm aware of, Your Honor. You understand we're perplexed, or at least I am. I speak for myself. I understand this is North Carolina, and, you know, there are a lot more guns and a lot more places carried by a lot more people than would be the case in some other places. But here we have a police officer who encounters a citizen, a person, nearly 2 a.m. in the morning. The person has a gun on him, and he doesn't say to the officer, Officer, I'm armed, just want you to know for everybody's safety, I'm armed, I'm carrying, I'm packing. Why didn't he say that? Why doesn't, if he's mature enough to carry a firearm at 2 o'clock in the morning, I would think he'd be mature and have the judgment to know that when he encounters a law enforcement officer investigating what you call an alleged robbery, but I don't think it's an alleged robbery, there really was a robbery at that restaurant nearby. I'm perplexed as to why an adult, mature enough to carry a firearm, wouldn't recognize the danger that was presented by this circumstance to both himself and to the officer. I'm just perplexed. Well, the question may be one for the jury. That may be how the jury perceives that. That's the context in which your claim of excessive force is presented. It's not just a question for the jury. The cases are legion that we have to view this case from the perspective of a reasonable law enforcement officer. I think most reasonable law enforcement officers would believe. In fact, I've had a case, actually, last term. I sat on a case, United States v. Black, North Carolina, where maybe you're familiar with the case. An opinion written by Judge Gregory, where a couple of officers walk up on a group of guys in a parking lot. They're sitting around just chatting away, and the officer walks up, and one of the gentlemen says, Hey, I'm armed. Open carry in North Carolina, right? Open carry? Yes. And the officer went over to the gentleman and calmly and safely took the gentleman's firearm, put it in his car so that they could continue the encounter. Now, I'm not saying that that's required as a matter of law, but I would think that that's the way things would happen in a jurisdiction where there was an open carry law. And your client, it seems, and I'm not making a judgment here, but he did everything wrong. He took his hands off the car. He reaches for the gun. He didn't tell the officer that he was armed. What was he thinking? How did he think this was going to turn out? I want to also add to that. I think in Judge Davis' scenario, the fact of whether he was carrying it legally or illegally, the claim here is excessive force. And I'm not sure North Carolina carries any heavy burden on that than any of the other states. But the issue here deals with maybe the characterization from Judge Eagles in her ordering. And she says when, she says your client pulled a gun. I mean, that's essentially what the officer saw on the officer. And then she quotes the Elliott case and says, no citizen can fairly expect to draw a gun on a police without risking tragic consequences. And that's kind of the posture of the beginning of this case. We've been on many cases in which, when I look at this fact, this is a very tragic set of facts here. And all of the innocence of your client and what he seeks to do, maybe it comes from, Judge Davis alluded to a language problem, maybe a cultural understanding, I don't know. But the fact of the matter is that, given where he is, there tends to be a higher level of understanding of what you can and cannot do when you confront a police in certain areas. And once an officer tells you to put your hands on the hood and then he pulls a gun on you, it's incredible to think that someone would move his hand from that hood and pull that gun out without thinking, what in the world does that officer think I'm doing? He didn't tell him what he's doing. And I understand the officer could have said those things, but he's the one that takes the action after the officer points the gun. Then he takes an action to actually take his hand off that hood and touch that gun and pull it out. How in the world is an officer going to know what he's getting ready to do? Well, Judge Winn, my time is up, and if I may respond to that point. It is also incredible or not credible to believe that my client at that moment was going to engage in a gun battle with the officer, having the officer already identified the gun and trained the gun on him. I don't know if it's incredible to believe it. I can understand that might be something you could come to a thought based upon your client's evidence and like most people from his perspective only. But when you're looking at a sense of force, you're actually looking at an objective reasonable officer's action. And that's the problem is that looking at the officer's perception of what's happening here, is it reasonable? And why should we require the officer to take that risk? I mean, you seem to think it's incredible, but it happens all the time. Officers shouldn't have to take that risk is the point. Right. Judge Diaz, again, my time is up. But if I may respond, you know, there are cases where there is a threat. And the one that I cite in the brief is Brockington and Waterton where there is a threat made towards the officer. The officer engages with force. And then there is a pause and there is a passage of time where that threat abates. And I think here, just because my client, Mr. Ayala, removed a gun from his waistband and received that with force, that doesn't allow the officer then to say, oh, anything that happens after that point I'm immune from because, as Judge Winn said, you removed the weapon or you moved your hands in a way that threatened me. In this case, the facts go on to suggest that there was pause, there was reasonable time for the officer to stop. And that would have been excessive as well. Thank you, Mr. Lesser. You've reserved some time. You have your full rebuttal time. Thank you. Mr. Strudge? Good morning. May it please the Court, Judge Eagles down below, in defendant's view, correctly held that the plaintiff failed to carry his burden under Rule 56 of coming forward with competent evidence demonstrating that any genuine issue of material fact existed. I think you can surmise that we have some concerns about Mr. Ayala's conduct in this case. But it seems to me that the more difficult issue is this question of the pause between shots and the last one that apparently was the one that did the most harm in this case. And why wouldn't a four- to five-second break give the officer at least some time where a jury could determine, a reasonable officer could find that that would be sufficient time to reassess the situation and decide whether or not additional force was required in that circumstance? Your Honor, I will certainly address that question. I want to address something that Your Honor stated within the question, which is that the last shot was the one that unfortunately hit the spine. That is not totally certain, and I want to make sure the Court understands that. We don't need the total certainty as to the question of whether it creates an issue of fact. Oh, I understand. I understand. You just want to make sure it's not being stated as a fact. Yes, Your Honor. That's correct. That's correct. With respect to the question that you put to me, Your Honor, about why this four-to-five-second pause does not create a genuine issue, I think it's quite clear. There is nothing at all in the record about what was happening during this supposed four-to-five-second pause. There's nothing in the record about whether or not Mr. Ayala was on the ground or standing. There's nothing in the record whatsoever about whether Mr. Ayala appeared to be posing an imminent threat, whether he appeared to still be coming at the officer, whether he still appeared to be holding the gun. And a jury could only speculate about what happened during that four-to-five seconds. Remind us, please, how many shots were discharged. Five is the answer to the question. But the reason that I hesitated, Your Honor, is because I don't know that there is record evidence saying that, and I don't want to state something that is outside of the record. I will tell you that there is an assertion in plaintiff's brief that there were six shots fired, and he cites to something in the record that does not say that. He cites to an indication in the record that his expert said that there were at least five and maybe six. But I'm trying to answer the court's question. Weren't shell casings collected at the scene? They were. And there were five. And there were five. So where's the sixth shell case? There isn't one. Okay. There's an assertion without any citation of the record in plaintiff's brief that there was a sixth shell casing found. There is no such evidence in the record, and I wanted to make sure that was clear to the court. Is there any evidence in the record regarding the training, typical or otherwise, of officers with regard to how many discharges there are in a situation similar to this, or anything touching on those issues? Your Honor, there is nothing that talks about generalized training. However, the only thing in the record that speaks to training is the declaration, I can't remember if it was a declaration under the rule or an affidavit, of Officer Wolf indicating that when he realized that this suspect had pulled a gun out of his pants, that it was his training to fire until the suspect went to the ground, because only then can you be assured that you've neutralized the threat. And I think the cases speak to that, both from this circuit and from others, about how an officer needs to be able to do that. Okay. One of the most perplexing questions from your perspective, or that I have about your client's training and behavior, is the idea that he left the firearm in the possession of the plaintiff in the course of the Terry Pat death. Look, I'm no police officer, I haven't had that training, but I've never encountered a case, I can't ever remember a case in 26 years as a judge, where an officer didn't seize a weapon that he already had his hand on in the course of a pat down. And it just strikes me as very odd that your client, having discovered the weapon, and being hands-on with the weapon, instead of seizing the weapon, retreats away from the suspect, leaving the suspect in possession of the firearm. I frankly don't know what the police training is on that. So the plaintiff didn't explore that at all? Correct. Okay. That wasn't explored. But I think it is abundantly clear that once Mr. Ayala elected to remove a semi-automatic pistol from his pants in the presence of an officer, the officer has to take action to protect himself. And I think it was Judge Diaz who pointed out that a contrary rule on that would be asking officers to take risks that they might be guessing wrong about the suspect's intentions. So Judge Diaz pointed you to the area of this case that I would think would be the closest, and perhaps if there is an issue to be dealt with, would be the one that I would focus on. That's that last shot. And you've got testimony from witnesses or there's testimony from witnesses saying it's four or five seconds, which doesn't sound like much, but four or five seconds in a football game is a lifetime. And in between shots is a long time when you think about it. In all of the circumstances here, the question is once Mr. Ayala falls down, he apparently is unconscious. At least that's what the judge found, and that seems to be undisputed. So he doesn't know what's happening, but the medical experts seem to be the turning point here. And they say he was shot on the left backside? It would be underneath the shoulder blade on the left side. I think I'm not a football player, but I did play baseball. And so to me the most descriptive way is, and it was agreed to by the experts. Five seconds isn't much in a baseball game. Correct, correct. But it's the position of a right-handed hitter facing the pitcher, but with his shoulder turned in, you know, a closed stance like that. That's the most descriptive image. Is that pretty much strong evidence he was not facing the officer at the time he was shot? That means his back at least had turned around or somehow maybe he had turned himself, but he wasn't facing the officer at that time. He was not facing the officer in the sense that his chest would be at the officer. I completely agree with that, Your Honor. But it is absolutely not correct, as suggested by the plaintiff, that his back was turned to the officer. It was the side. But he did testify that he didn't turn his back on Officer Ayala while he was standing. And I recognize that at some point he lost all sensation as to what was going on, but at least while he was standing he testified that he didn't turn his back. Why shouldn't we credit that testimony, which would then suggest, at least perhaps a jury could infer, that he must have been shot either while he was falling or, as Ayala insists, even though he can't testify directly about this, while he was down on the ground. I don't think it's a matter of discrediting testimony. I recognize that on summary judgment the court doesn't discredit testimony unless it is shown that it couldn't be true by uncontroverted medical evidence or something of the sort. But here the uncontroverted medical evidence is that the side was turned at the time of the shot and that at most what you've got is the shoulder turned in a little bit. I don't want to take off my coat because I don't think that's right, but it's right underneath the shoulder blade on the side. And so the testimony that he didn't turn his back is certainly offered to try to suggest, hey, he shot me in the back, but I didn't turn my back to him. Well, he didn't turn his – the shot wasn't fired when his back was turned to him, when his side was turned to him. So therefore I'm not asking the court to discredit it but to understand it for what it is, and that's something that doesn't create a genuine issue. But they couldn't determine if it was a shot that was fired while he was standing up or on the ground. I understand that from the medical – that bullet, it didn't pass through him, I take it? No. There's the X-ray in the record where it goes across and stops in there. But plaintiffs, two experts, both his treating physician and his retained expert, said we cannot say one way or another what position he was in, what position the body – the shooter was in, whether he was standing, whether he was on the ground. The expert that I retained concluded that the evidence shows he was standing. Obviously, I don't think that is dispositive for me on summary judgment. I think their absence, their expert's absence of being able to point to anything that says he was on the ground is important to me on summary judgment, but I point that out just in a fair response to Your Honor's question. So is the question whether there's sufficient evidence from which a reasonable jury could infer one way or the other that he was standing or that he was down, if the evidence is – he says his evidence in the light most favorable to him would be I didn't turn and the medical evidence is that he was shot from the left backside, as you've illustrated here, and the medical evidence can't say whether he was standing or on the ground, which means they can't tell you he was standing. He could have been on the ground. There's evidence that he could have been on the ground. I'm just wondering, is there enough for the inference to then arise that this officer, having waited four or five seconds, could have shot him while he was on the ground and a jury could then infer that really that threat was abated at that point and there was no need to do that? There is a term in the law, I think, called stacking of inferences, and I think that requires the stacking of inferences in a manner that is impermissible. I think that one thing the court needs to remember is that we've got a very dark street. Your Honor spoke about it being dark. Actually, the testimony from plaintiff, I think, was, quote, very dark street. We've got blinding muzzle flash from this gun that is described in the declaration or affidavit of Officer Wolf about how it's disruptive to his shooting and trying to focus in on the target and figure out that the threat is neutralized. I don't think that there's anything about that or about the fact that there was a four to five second delay between the second to last shot and the last shot. It does anything to create an inference about what occurred during that time. There's nothing that the plaintiff has offered that makes it more reasonable than that my officer walked over and shot him while he was on the ground as opposed to my officers trying to deal with the blinding muzzle flare and figure out whether it's safe to continue shooting, whether he's still presenting a threat, et cetera. And therefore, I think that really would be a stacking of inferences situation. I think it's also important to point out that there is nothing here in the record to speak to how rapid the earlier shots were. It is asserted in plaintiff's brief that Officer Wolf testified that it was, I think the words used in the brief were rapid sequence. He did not. He testified that he continued shooting until he was able to confirm that the suspect had gone down. The plaintiff himself. Well, there were witnesses who said they heard this, and there was a four or five second pause between the last one. Correct. What I'm talking about, however, Your Honor, is the earlier shots. The earlier shots, yes. And all those witnesses say is that they heard gunshots. Don't describe it being a group of gunshots. Don't describe the pace of those gunshots, the time in between them. And so what I'm getting at, trying to make a full answer to Your Honor's question, is that we don't know whether it was shoot, pause of some seconds, trying to identify the target, still seeing the target standing, dealing with the muzzle flash between the first shot, second shot, third shot, et cetera, so that there really isn't an effective clear break or an effective pause, even if you were to conclude that four seconds or five seconds could be that. Let me ask you about the initial actions of the officer. Yes, Your Honor. Why it somewhat concerns me, even though I'm not sure it's the issue here. With the increasing indications that citizens have a right to carry weapons and can possess a legal right to carry a weapon, more and more citizens are going to have weapons walking around. And if a citizen is stopped, officer walks up and simply pats him and finds a gun, nothing is illegal at that point. There's nothing illegal being done. But he then drops back and he points a gun right at him right then, that second, as though he's a criminal. And he's not. He's just carrying a gun. That's his right. Just like he's carrying, I guess, a pack of cigarettes or whatever. Is that? I mean, and I understand that the circumstances here, given there was a robbery that occurred, he's going through the community, he's questioning this potential person who he might suspect. I know there's some question that you were talking about African-American guys and this guy is not. And maybe those circumstances lead that this is a different situation. But how do we differentiate that from just any citizen who's walking down the street, lawfully carrying a weapon, as the law is increasingly moving to allow people to do, and once you touch that weapon, is it to be expected that an officer is going to immediately be able to drop back, point a gun directly at you, point blank, and then say nothing? I understand your Honor's question. Doesn't it concern you a bit? I mean, think about it in terms of how many people are walking around with a gun and what will be the reaction and what is going to be allowed under those circumstances. And then when you begin to add in the demographics, that maybe this happens in a high-crime area more than others, or maybe this is something that you wouldn't expect to happen if you were in a more affluent community, it really is disconcerting when you're trying to write an opinion and you say in the first instance the actions of the officer is reasonable at the beginning of this. And that troubles me, given the fact it doesn't appear, and there's no indication, Mr. Ayala had done anything illegal. As a citizen walking down the street, I don't know about this gun, if he had a weapon permit or not, but if he does, or he can carry one open or whatever, then there's no indication anything is illegal at that point. My hesitancy in answering is I know that I am bound by the record evidence. You asked a question about whether this gun was legally in his possession, whether he was authorized to carry it, and I would like to answer that question, but I need to go on. Well, I don't think it's necessary because that's not really the relevancy of my question. It's not a question. This is he didn't know at the point that he was doing it that it was. That's the key. This is a citizen carrying a gun, which the law permits citizens to do if they have it proper. He didn't ask for it. Did you have it? And I'm not sure you got to show authorization. Do you have to show when an officer approaches, do you have to pull out something and show that you have a concealed weapon permit? I'm sorry, but I do not know the answer to that. That's troubling. I mean, if you don't, I mean, if you have to have that concealed weapon permit on you at the time, officer stops you and he asks, where's your permit? And you don't have it, then he can do something. I don't think you do. I think you can carry one if you got that permit, and you can just carry it just like you do anything else. I'm not sure it's like a driver's license, but I don't know. I don't know either, but I would submit that that issue in this excessive force case isn't germane to what the disposition of this case should be because the officer's actions are judged by what a reasonable officer would have perceived at the time the decision to make force, to use force. And I'm agreeing with you on that. I think you're right. There is that differentiation, but when you write an opinion like this, the question is how does it then transfer to other situations in which the innocence of the conduct is clearly there, and yet you then have empowered an officer to say, is it the mere fact he has a gun, or is it because of where he is, or is it because there's a robbery, but there's no connection, there's nothing there, no indication this man looks anything like those that's been described, plus he's walking toward the scene. You wouldn't think anyone who has been involved is going to be walking toward the scene of the crime. Unless they're trying to evade the officers that are canvassing the scene and having to change their routes because of that. And I'll tell you that there is nothing in the record about there being anything about this neighborhood that distinguishes it from any other neighborhood. I've been there. That's why it's troubling. That's why I say I just don't know what this means. And it really makes it, I guess at 2 o'clock in the morning to be walking around with a gun. You can move off this. Okay. All right. Well, I did not have anything else for the Court. Thank you. Thank you, Mr. Strange. Mr. Lester. Well, I think Judge Wynn's point is well taken, is to the first instance, was the officer's seizure of Mr. Ayala reasonable? What was the probable cause to essentially point the gun at him? I think you ought to spend your time on the last shot. Right. I mean, we could probably go back and forth on that initial one. Right. And that's more of a hypothetical situation in terms of what if. But the question is, given the circumstances, it is late at night. It's 2 o'clock in the morning. And here he's walking on the street. And what really kind of hurts your clients, he's got his hands on that hood. He takes them off. And so that initial thing is really problematic from that perspective. But the last shot, you might want to speak on that a little bit. Sure, Your Honor. The court, this court in Waterman, laid down a clear marker for these types of cases. And it says the force justified at the beginning of the encounter is not justified seconds later if the justification for the initial force has been eliminated. And that is the law in the Fourth Circuit. And then this court applied that law in Brockington v. Boykins, a case in which. Those are different cases. Wasn't that some case where the car was driving away or something like that? This guy is not in a car driving away. It's not clear. The officer says he didn't shoot him after he fell. I mean, that's the officer's testimony. And your client doesn't know. And so all you've got are the medical experts. And they only can say he was shot from the side. You saw the illustration of the other side indicating like a baseball hit or maybe this hit him from the side here, which could have been turned or however. But your client said he didn't turn, which Judge Diaz pointed out as being perhaps a fact that the jury could consider. But this business then leads us to what is being characterized as the jury would have to make an inference upon an inference upon an inference. And we're stacking that's not permissible to some degree. That's what I think you need to address. Right. Well, Your Honor, with respect to the cases being a little different, you certainly don't need identical facts to create a clearly established right. And so in Waterman, you had a paw. The entire incident occurred in about six seconds. And you had a car racing towards police officers, and then the police officers firing into that car, the car passing, and then the police officers continuing to shoot into that car. And that's where the court said, whoa, you cannot continue to shoot into that car. When you continue to shoot into that car, that was reasonable. That was unreasonable. The threat had been passed. And so this court in Judge Davis and Judge Wynn on that opinion in Brockington v. Boykins applied that same rule in a case where an officer was shooting a man, and then after he fell to the floor, he shot him some more. And the court said in that case that was unreasonable force. And so here we have similar circumstances. It wasn't the same conditions in that case as this one. It wasn't 2 o'clock in the morning with the kind of limited view. My understanding was that they were, and you may know the case better than I, Your Honor, at this point, but was that they were chasing each other on a stairwell, and the man was shot to the point where he fell off the stairwell. And then while the officer was above the victim, he continued to shoot. And here we have a circumstance where But Brockington was a 12B6 case, wasn't it? That's correct. So it's different, obviously. The procedural posture is different. The court was required to accept the allegations of the complaint as true. We're at summary judgment. We grant every inference to you, but you've got to come forward with evidence to show that the officer knew that the harm had been dissipated here. And, you know, I think that's problematic. What's the evidence? The evidence is that Mr. Isla testified that he was shot in the hip, and that shot put him on the ground. And when he was on the ground, he was knocked unconscious briefly. Actually, what he says is that the fifth shot, it was after the fifth shot that he fell. Correct. So I'm not sure I'm following. He was still standing at the time of what the defense contends was the last shot. No, Your Honor. That's not the contention. I think that's what the defense says. Correct. That is the defense. Where's the evidence that there were more than five shots? The evidence is there's evidence that there were five shells, but we believe that there were seven wounds. I understand you believe there were seven wounds, but where's the evidence that there were more than five shots, five discharges of the officer's weapon? The evidence is that there are seven wounds, and that those seven wounds. Well, several of the wounds are through and through wounds. Of course you're going to have. Right. It is possible that there could have been five. It is also possible there could have been six, given the through and through. I notice in the deposition your client used the services of an interpreter. That's correct. And yet you tell us here, and I don't doubt your representation at all, that there's no language problem. Now, of course, for many people for whom English is a second language, in some circumstances it's good to have an interpreter present and actually to use an interpreter. But I can't shake loose from the idea that part of what's going on here is a, I don't know, language slash cultural disconnect? You don't think so? Well, Your Honor, there may be. And I think those are questions for the jury to answer as to what was reasonable under these circumstances, given the situation. Did the interpreter actually, I mean, do you want to change your answer? I'm just a little confused. You said rather emphatically when I asked before, there is no language problem. And then the reality is you and your client decided together in consultation, quite appropriately, that when he was deposed in the case, he needed the services of an interpreter. And there's just at least some tension there. If there's no language problem, why did he need an interpreter? Well, I mean. Just an abundance of cause? I mean, look, I'm not trying to make a big deal out of this. I'm asking you to sort of. Yeah, my understanding, Judge Davis, was that there was some concern about the questioning and that there would be some benefit to having an interpreter available if needed. I don't recall, but I'd have to go back and look to see if the interpreter actually preceded the whole time or whether he started and then stopped. Fair enough. But the real fact is that there was no communication. Going to Judge Wynn's point, I know he asked me to move to the second point, but Judge Wynn's point, there was a lack of communication. Well, there was. I'm sorry. I didn't mean to cut you off. But the most important communication in this case was, put your hands on the hood of the car. And that was stated. It's undisputed. And it was understood. It's undisputed. That's the most important communication that took place in this case. Anyway, if you want to sum up. Yes, my time is up, and I would, Your Honor. The evidence we believe shows that he was shot while he was on the ground and that there was a pause of four to five seconds in which the threat had dissipated and that this officer should have known or could have known that the threat had been dissipated and that, therefore, any force beyond shooting him while he was standing, it was unreasonable. Thank you very much. The evidence in the inferences in his favor suggests there should be a jury trial on that question. Thank you very much. We'll come down to Greek Council and then proceed immediately to our second case.
judges: Andre M. Davis, James A. Wynn Jr., Albert Diaz